**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-1032

_____

IN RE: ZOSTAVAX (Zoster Vaccine Live) Products Liability Litigation

MARIANA ABARTA and all other Plaintiffs listed in Exhibit A to Notice of Appeal,

Appellants

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. No. 2-18-md-02848)
District Judge: Honorable Harvey Bartle, III

_____

Argued on October 31, 2023

Before: JORDAN, ROTH and AMBRO, Circuit Judges

(Opinion filed: July 16, 2024)

Howard J. Bashman          [**ARGUED**]
500 Office Center Drive
Suite 400
Fort Washington, PA 19034

    *Counsel for Appellants*

Christopher J. Conoscenti
Julie Galbo-Moyes
Kathleen S. Hardway
Dino S. Sangiamo             [**ARGUED**]
Venable
750 E Pratt Street
Suite 900
Baltimore, MD 21202

Catherine M. Recker
Welsh & Recker
306 Walnut Street
Philadelphia, PA 19106

              *Counsel for Appellee*

————————

OPINION[*]

————————

ROTH, Circuit Judge

Plaintiffs appeal the order of the District Court for the Eastern District of Pennsylvania dismissing with prejudice 1,189 of their cases against Merck & Co., Inc. and Merck Sharp & Dohme Corp. (Merck) in Multidistrict Litigation case number 2848 (MDL 2848). Finding no abuse of discretion, we will affirm.

## I.      Factual Background and Procedural History

The varicella-zoster virus (VSV) causes chickenpox, typically in childhood, and shingles, typically in adulthood.[1] Once a person is exposed to the VSV, it remains dormant

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] *In re Zostavax (Zoster Vaccine Live) Prod. Liab. Litig.*, No. CV 18-MD-2848, 2022 WL 952179, at *1 (E.D. Pa. Mar. 30, 2022).

in their body, with the potential for reactivation, for life.[2]  If the VSV reactivates, it can result in shingles, which manifests as a painful rash.[3]  Virtually everyone over the age of 30 in the United States has had chickenpox and carries the so-called "wild-type" strain of the VSV in their systems.[4]  One in three adults will experience shingles.[5]

Zostavax is a vaccine developed and manufactured by Merck to prevent shingles in adults 50 years of age and older.[6]  The active ingredient in Zostavax is a "live-attenuated" strain of the VSV, a weakened form of the wild-type strain found in the body of someone who has had chickenpox.[7]  Zostavax prevents shingles by establishing immunity before an outbreak occurs.[8]

In August 2018, the Judicial Panel on Multidistrict Litigation (JPML) centralized into MDL 2848 cases where plaintiffs alleged that Zostavax caused them to develop shingles and/or other injuries.  The District Court overseeing MDL 2848 divided the 2,000+ cases into Groups A, B, and C based on alleged injury.[9]  This appeal pertains only to the 1,189 Group A cases involving allegations of "shingles or shingles-related injuries."[10]

---

[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.* at *2.
[7] *Id.*
[8] *Id.*
[9] *In re Zostavax (Zoster Vaccine Live) Prod. Liab. Litig.*, No. MDL 2848, 2022 WL 17477553, at *1 (E.D. Pa. Dec. 6, 2022).
[10] Within Group A, there are (1) roughly 500 cases involving allegations of shingles ***and*** non-shingles related injuries and (2) 1,189 cases involving ***only*** allegations of shingles or shingles-related injuries. Group B cases involve allegations of various other injuries and Group C cases pertain to hearing loss injuries.  *See id.* at *1.

From 2018 to 2021, the parties worked up five bellwether Group A cases for trial.[11] After three years of extensive fact and expert discovery, Merck successfully moved to exclude the testimony of plaintiffs' specific causation expert Dr. Mark Poznansky. Because all five bellwether plaintiffs had been infected with chickenpox, Poznansky had to perform a "differential diagnosis" on each of them—i.e., rule out reactivation of the wild-type virus as the obvious alternative cause of their shingles.[12] After analyzing each of Poznansky's reports, the District Court concluded that Poznansky failed to do so, and as such, could not offer a reliable opinion on specific causation.[13] The District Court also noted that none of the five bellwether plaintiffs had "undergone a polymerase chain reaction assay, known as a PCR test, which can reliably discern between the live-attenuated and wild-type strains."[14] Because plaintiffs could not establish a causal connection between Zostavax and the onset of their shingles, the District Court entered summary judgment for Merck in all five cases.[15]

---

[11] *In re Zostavax*, 2022 WL 952179, at *1.

[12] *In re Zostavax (Zoster Vaccine Live) Prod. Liab. Litig.*, 579 F. Supp. 3d 675, 678 (E.D. Pa. 2021).

[13] *See id*. at 684–85.

[14] *Id*. at 677.

[15] *In re Zostavax*, 2022 WL 952179, at *1 (noting that the court had entered summary judgment for Merck in all five cases).

In January 2022, Merck moved for entry of a *Lone Pine* order[16] requiring all remaining Group A Plaintiffs to produce PCR test reports.[17] Plaintiffs opposed Merck's motion because (1) none of the Group A Plaintiffs had ever been PCR tested, and (2) PCR testing can only be done on existing rashes, but most (if not all) of the Group A Plaintiffs' rashes had already healed. Nonetheless, in March 2022, the District Court entered the order (PTO 426), giving Group A Plaintiffs 90 days to produce PCR test reports. In an accompanying opinion, the District Court cited "compelling medical authority" suggesting "that a [PCR] test . . . is the ***only*** way to tell" whether shingles was caused by the latent chickenpox wild-type virus strain or Zostavax's live-attenuated virus strain.[18] The District Court also observed that plaintiffs failed to offer "***any*** medical literature or expert medical opinion" explaining otherwise, or provide "any guidance" as to how the Group A cases could otherwise proceed.[19]

After plaintiffs failed to comply with PTO 426, Merck moved to dismiss the 1,189 Group A cases under Rule 41(b) and alternatively sought summary judgment under Rule

---

[16] *See Lore v. Lone Pine Corp.*, 1986 WL 637507, at *4 (N.J. Super. Ct. Law Div. Nov. 18, 1986) (unpublished). Though they vary in form, *Lone Pine* orders generally "require plaintiffs to produce threshold *prima facie* support for their claims," including "specific evidence like proof of a medical diagnosis." *Hamer v. LivaNova Deutschland GmbH*, 994 F.3d 173, 178 (3d Cir. 2021) (cleaned up). *Lone Pine* orders are "routinely used . . . to streamline litigation in mass tort cases." *Id.* (citing *In re Vioxx Prods. Liab. Litig.*, 557 F. Supp. 2d 741, 743 (E.D. La. 2008) (collecting cases)).

[17] Specifically, Merck requested an order requiring "laboratory reports or other records documenting that strain identification testing detected vaccine-strain [VSV] in a rash sample from [each] plaintiff." Appx963.

[18] *In re Zostavax*, 2022 WL 952179, at *2 (emphasis added).

[19] *Id.* at *3 (emphasis added).

5

56.[20]  At the parties' request, the District Court stayed Merck's motion to the extent it sought summary judgment, and in December 2022, dismissed the 1,189 cases with prejudice.[21]  In so doing, the District Court observed that "the record [remained] undisputed that [PCR] testing is the only way to prove whether Zostavax or the wild-type virus caused a person's shingles,"[22] and ultimately concluded that plaintiffs had been given "a more than sufficient opportunity [] to produce any *prima facie* evidence of specific causation in the Group A cases."[23]  Plaintiffs appealed the District Court's order.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1332 and 1407.  We have jurisdiction under 28 U.S.C. § 1291.  We review Rule 41(b) dismissals for abuse of discretion.[24]  In the context of an MDL, we also account for the District Court's "increased burden" while being mindful not to "alter the substantive rights of the litigants."[25]

## III.    Discussion

Plaintiffs contend that the District Court abused its discretion first by entering PTO 426 and then by dismissing the Group A cases under Rule 41(b).  We disagree on both counts.

### A.    The District Court did not abuse its discretion by entering PTO 426.

---

[20] *In re Zostavax*, 2022 WL 17477553, at *1 n.1.
[21] *Id.*
[22] *Id.* at *3.
[23] *Id.* at *5, 6 n.1.
[24] *Hamer*, 994 F.3d at 177 (citing *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002)).
[25] *Id.* (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, 718 F.3d 236, 243 (3d Cir. 2013)).

Though plaintiffs concede that *Lone Pine* orders can serve a proper purpose in certain circumstances, they contend PTO 426 was improper for two reasons. First, they claim that the District Court entered PTO 426 based purely on an assumption that PCR testing is the only way to establish specific causation in the Group A cases. Second, they argue that PTO 426 mandated production of "non-existent evidence that never existed" and was incapable of being created after-the-fact.[26] Neither argument holds water.

First, the District Court did not enter PTO 426 based on mere assumption. Plaintiffs knew from the start that they would have to account for and exclude the "obvious alternative cause" of shingles for the Group A cases: the wild-type chickenpox strain of the VSV latent in almost every person over the age of 30.[27] But even after three years of litigation, plaintiffs had not drummed up a single piece of medical literature or expert medical opinion explaining how it can be determined that Zostavax and not chickenpox caused a person to contract shingles other than through PCR testing.[28] PTO 426 was therefore premised on uncontradicted record evidence—not an assumption—that PCR testing is the only way to establish specific causation.

Second, "an MDL court needs to have broad discretion" to enter *Lone Pine* orders that drive disposition on the merits.[29] Indeed, the express "goal" of a *Lone Pine* order is to "winnow non-compliant cases from an MDL."[30] If a *Lone Pine* order could only require

---

[26] Appellants' Br. 22.

[27] *In re Zostavax*, 579 F. Supp. at 679; *see also id.* at 678 ("Plaintiffs do not dispute that the use of a differential diagnosis by their expert is necessary").

[28] *In re Zostavax*, 2022 WL 952179, at *3.

[29] *Hamer*, 994 F.3d at 178 (internal quotation marks omitted).

[30] *Id.* (cleaned up).

the production of evidence that already exists or can be created, it would fail to serve that goal. We therefore conclude that the District Court did not abuse its discretion by entering PTO 426.

**B.** **The District Court did not abuse its discretion by dismissing Plaintiffs' cases with prejudice under Rule 41(b).**

Plaintiffs make two arguments as to why the District Court abused its discretion by dismissing their cases pursuant to Rule 41(b). First, they contend that "the combined improper use of a *Lone Pine* order and a Rule 41(b) dismissal"[31] denied them their rightful opportunity to work up and present the 1,189 Group A cases on summary judgment.[32] Second, they assert that the District Court improperly weighed the *Poulis* factors.[33] Neither argument persuades us that the District Court abused its discretion.

**i.** **The District Court was not required to resolve the 1,189 Group A cases through summary judgment.**

We have recognized that an MDL court "must be given wide latitude with regard to case management."[34] This wide latitude applies not only to issuing case management orders but also to dismissing cases for non-compliance with such orders under Rule 41(b),[35]

---

[31] Appellants' Br. at 4.

[32] More specifically, Plaintiffs claim they were entitled to conduct case-specific discovery for each Group A Plaintiff and come forward with "the most robust" evidence they could muster to prove specific causation by a preponderance of the evidence under their respective states' laws. *Id.* at 14.

[33] *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984) (setting forth six factors a trial court must balance before dismissing a complaint).

[34] *In re Asbestos*, 718 F.3d at 247.

[35] The rule provides in relevant part: "If the plaintiff fails to prosecute or comply with . . . a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b).

8

especially where plaintiffs are "put on notice by a motion that dismissal was being sought, and given the opportunity to oppose that motion."[36] Opposing a Rule 41(b) motion gives plaintiffs a "full and fair opportunity to be heard regarding [their] failure to comply with the court's order."[37] Likewise, a dismissal following a fully briefed motion presents fewer concerns than a *sua sponte* dismissal.[38] This is "particularly true" when an MDL court tasked with overseeing thousands of cases "has already elucidated [its] interpretation of a case management order and has warned the parties that failure to comply with the order could result in dismissal."[39]

Had the District Court entered PTO 426 and then dismissed Plaintiffs' cases *sua sponte* for their failure to produce PCR test reports, Plaintiffs' request for reversal may have been warranted. But that is not what happened. Plaintiffs were twice put on notice as to the risk of non-compliance with PTO 426 and twice afforded full and fair opportunities to explain themselves. The first time was when the District Court entered PTO 426 with an accompanying opinion. While PTO 426 only ordered Plaintiffs to produce a certain type of specific causation evidence (PCR test reports), the opinion put Plaintiffs on broader notice: either "make the court aware that they have prima facie

---

[36] *In re Asbestos*, 718 F.3d at 245.
[37] *Id.* at 247; *see also id.* ("In such a situation, the plaintiff has every incentive to explain his reasons for failing to . . . comply with the district court's orders.").
[38] *See id*.
[39] *Id.*.

support for any of their claims" or else Merck would be entitled to move for dismissal.[40] In the 90 days that followed,[41] Plaintiffs produced nothing, made no requests for an extension, and proposed none of the alternatives to District Court's *Lone Pine* order that they now proffer on appeal. Plaintiffs were put on notice a second time when Merck moved to dismiss their cases under Rule 41(b), and they were afforded another opportunity to be heard through their opposition to that motion.

It would have been pointless to allow the Group A cases to proceed to summary judgment because plaintiffs had failed to explain how they could prove specific causation without PCR tests.[42] In opposing Merck's motion for entry of PTO 426, Plaintiffs claimed their experts could prove Zostavax and not chickenpox caused their shingles "[e]ven without [PCR] testing and using differential diagnosis techniques," but did not identify their experts or explain how they would accomplish these aims.[43] Plaintiffs repeated that argument in opposing Merck's motion for dismissal, but offered no more than a conclusory claim that "expert evidence [would] differ from what was introduced in the Group A Bellwether process" and that this evidence had been introduced and was being briefed in

---

[40] *In re Zostavax*, 2022 WL 952179, at *3; *see also In re Zostavax*, 2022 WL 17477553, at *4 (explaining that "the premise" of PTO 426 "was [] merely to require each plaintiff to come forward with prima facie evidence, either through laboratory reports or other records, that can support the claim that Zostavax caused his or her shingles rather than the wild-type virus.").

[41] Plaintiffs were given 90 days to comply with PTO 426. *See id*. at *3 n.4.

[42] As the District Court correctly noted, "[e]ven if state law rather than federal evidence rules [were to] apply," Plaintiffs could not and did not show that "any state does not require proof of specific causation by a medical expert or that proof of specific causation through a medical expert in any state could be established here without a PCR test." *In re Zostavax*, 2022 WL 17477553, at *5 n.6.

[43] Appx895.

New Jersey.[44] If Plaintiffs really believed "this evidence might defeat Merck's pending motion to dismiss," we, like the District Court, find it "puzzling" that Plaintiffs would "share their allegedly critical and supportive evidence" in New Jersey but not in the MDL."[45] To put it bluntly, if Plaintiffs had a way to prove specific causation, "common sense dictates that it would have surfaced by now."[46] We therefore conclude the District Court did not abuse its discretion in dismissing the 1,189 Group A cases under Rule 41(b) instead of allowing them to proceed to summary judgment.

### ii.       The District Court properly weighed the *Poulis* factors.

To determine whether a district court abused its discretion in effecting a Rule 41(b) dismissal, we evaluate the way it balanced the six *Poulis* factors:  (1) the extent of the party's personal responsibility;  (2) the prejudice to the adversary;  (3) a history of dilatoriness;  (4) whether the conduct of the party or the attorney was willful or in bad faith;  (5) the effectiveness of alternative sanctions other than dismissal; and  (6) the meritoriousness of the claim or defense.[47] No single factor is dispositive, nor do all six factors need to be satisfied to warrant dismissal.[48] In the context of an MDL, "our ability to satisfy ourselves that the district court did not act arbitrarily, and did consider the relevant factors, is made easier" when a dismissal follows a contested motion.[49]

---

[44] Appx1281.
[45] *In re Zostavax*, 2022 WL 17477553, at *4.
[46] *Id*. at *5.
[47] *In re Asbestos*, 718 F.3d at 246 (citing *Poulis*, 747 F.2d at 868).
[48] *See id*.
[49] *Id*. at 248.

11

We find no abuse of discretion in the District Court's conclusion that the *Poulis* factors favor dismissal.[50] We agree that plaintiffs did not act "willfully or in bad faith insofar as they [were] unable to produce nonexistent PCR tests."[51] But, as the District Court aptly observed, that is not the full story. In opposing entry of PTO 426 and dismissal, plaintiffs insisted they could prove specific causation in the remaining Group A cases without PCR testing. But in related state court litigation, Poznansky and plaintiffs' counsel admitted that PCR testing was "needed" to do so.[52] As for the remaining factors, they too weigh in favor of dismissal. By the time they were dismissed, the Group A cases had been "at a standstill" for over a year with nothing to indicate they could ever succeed on the merits.[53] Continuing to carry 1,189 non-meritorious cases on the MDL docket would be severely prejudicial to Merck, and dismissal was the appropriate and "effective sanction."[54]

For all of these reasons, we conclude that the District Court acted within its discretion when it dismissed the 1,189 Group A cases with prejudice.

## IV. Conclusion

We will affirm the District Court's order dismissing the 1,189 Group A cases.

---

[50] While the District Court "did not explicitly weigh" each of the six factors, the court sufficiently "signaled [its] view" that all weighed in favor of dismissal. *In re Asbestos*, 718 F.3d at 248 (concluding that MDL court properly considered the *Poulis* factors).

[51] *In re Zostavax*, 2022 WL 17477553, at *5.

[52] *Id.* at *2.

[53] *Id.* at *5.

[54] *Id.*